## APPEAL OF JOHN REIGHARD ET AL., EXRS.

### [ESTATE OF JOHN SANKEY, DECEASED.]

FROM THE DECREE OF THE ORPHANS' COURT OF CENTRE COUNTY.

Argued April 24, 1889—Affirmed at Bar.

(a) A testator directed his executors to invest $8,000 in United States bonds, and pay the interest on the same to his wife for her life, this interest to be "her absolute and exclusive property." Until the interest on the United States loan should become due, the executors were directed to pay to her "a sum proportionate to the said interest for the time the same shall not be due."

(b) He further directed: "Should the government of the United States at any time during the lifetime of my wife cancel their bonds by payment, or should any other possible contingency arise, by which the interest of the said bonds would not be available to my said wife, then in that case, she, my said wife, shall draw, or receive from my estate, a sum annually equal to the interest of said bonds."

(c) At the time of the testator's death he had in his possession $3,500 invested in United States 7–30 notes which were redeemable at the end of three years and were fundable in 20 year bonds bearing six per cent interest. The widow claimed that she was entitled to interest on the $8,000, continuously from her husband's death, at the rate of 7.3 per cent.

1. In such case, the widow was entitled to be paid interest on the fund at six per cent, and any deficiency in the income, caused by the inability of the executors to invest the principal, must be made up out of the principal of the testator's estate.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS and Mc-COLLUM, JJ.

No. 85 January Term 1889, Sup. Ct.

On June 2, 1886, Mary S. Sankey, widow of John Sankey, deceased, presented her petition to the Orphans' Court, praying for a rule on the executors of John Sankey, who died March 29, 1865, to show cause why they should not pay her the interest on $8,000, at the rate claimed to have been provided for in her husband's will. An answer was filed by the respondents, denying the petitioner's claim as it was made.

The material parts of the decedent's will, which was dated March 28, 1865, and the other facts of the proceeding, sufficiently appear in the opinion of the court below, filed October 15, 1888, by KREBS, P. J., 46th judicial district, holding special term:

The application in this case requires us to construe the last will and testament of John Sankey, late of Millheim borough, deceased. In that portion thereof which relates to the provisions for the maintenance of his widow, Mary A. Sankey, he provides: "I direct that my executors hereinafter named shall invest out of my estate in United States loan to the amount of $8,000, or so much thereof as is not already invested by myself in such loan. I direct that my wife Mary A. shall draw the full interest of said investment of $8,000, each and every time the same may be due, for her livelihood and support, and shall so continue to draw the said interest during the period of her natural lifetime, or so long as she remains my widow. The said interest of the said investment shall be her absolute and exclusive property, for her own use and benefit, and she shall

not be accountable to any person or persons whatever for the same or any part thereof."

In this part of the will of the testator, two thoughts are clearly expressed: first, that $8,000 should be securely invested for the use of his widow, when he died, and second, that the interest thereon should be hers to do, maintain and support herself, and to dispose of according to her pleasure. He intended that she should from the time of his death have the benefit of the interest on this sum, although there might be delay in procuring the funds from the estate, to make the investment in United States loans, and until the coupons thereon should become due. To guard against this delay and to insure the payment to her of the interest on the amount set apart to her use during the full period of her widowhood, he further provided, viz.: "Until the interest on the investment of United States loan shall be due and available to my said wife, my executors shall pay to my said wife a sum of money proportionate to said interest for the time the same shall not be due, and this my executors shall do as soon as possible after my death."

It seems that at the time of Mr. Sankey's death he had already invested $3,500 in the United States loan and known as the "seven-thirty notes." These notes were redeemable by the government at the end of three years from the date of their issue, and this fact doubtless moved the testator to insert the following provision in his will, etc., viz.: "Should the government of the United States at any time during the lifetime of my dear wife cancel their bonds by payment, or should any other possible contingency arise by which the interest of the said bonds would not be available to my said wife, then and in that case, she, my said wife, shall draw or receive from my estate a sum annually equal to the interest on said bonds." In this provision is expressed again very clearly the burden upon his mind and heart, that his wife in the years of her widowhood should receive the interest upon the sum of $8,000 set apart to that purpose, and if, as he states, from "any possible contingency," the interest on this sum is not available, his executors are commanded and directed to pay it to her out of the funds of the estate. The exact language of the testator is: "She, my said wife, shall draw or receive from my estate a sum annually equal to the interest on the bonds."

The real point of contention in this case, however, is, what rate of interest on the $8,000 did the testator intend to give his wife. The counsel for the widow now contend that, inasmuch as a part of the $8,000 fund was invested by the testator in his lifetime, in what was known in financial parlance as seventhirty notes, bearing interest at the rate of two cents per diem on the sum of $100, that, therefore, he intended she should have interest on the whole $8,000 at the same rate, or $586.66 annually. In determining, however, whether this is a correct thought, we may consider the times and circumstances surrounding the testator at the time he invested a part of this fund in the United States loan, or seven-thirty notes.

The history of the financial legislation of that period of our country shows that the treasury notes of the seven-thirty denominations were due and redeemable at the end of three years, and were fundable in bonds of the United States, twenty-year bonds, bearing six per cent interest: See acts of Congress, July 17, 1861, and August 5, 1861; also the acts of Congress of June 30, 1864, and March 3, 1865. Under these several acts of Congress, 800 millions of the seven-thirty notes were issued, payable principal and interest in lawful money. All of these treasury notes, from the earliest to the latest issue, were fundable in six per cent bonds, and this fact was printed on the back of the notes, and every holder must have known the fact. This knowledge was possessed by the testator and called forth, no doubt, the provision last quoted from his will relating to the cancellation of the United States bonds, as he called them. It is hardly necessary to say that the purpose of the United States government in making these treasury notes bear seven and three tenths per cent, was to equalize in some degree the difference between "lawful money" and the value of gold coin. It results, from this brief review of the past, relating to financial legislation, and which we deem pertinent to the question before us, that the highest interest paid by the United States government in gold was six per centum, the same as the legal rate in our own commonwealth. And we, therefore, conclude that the testator, with the knowledge that the treasury notes of the seven-thirty issue being fundable at maturity, three years from their dates, which was either the 15th of August, 1864, the 15th of June,

1865, or the 15th of July, 1865 (as they were issued in three series of these respective dates), in six per cent bonds, intended his widow to draw six per cent on the sum of $8,000.

[But the answer to the application sets forth on the part of the executors reasons why they have not paid her out of the corpus of the estate a sum annually equal to six per centum on $8,000; and they show, first, that they in good faith invested the money in first mortgages on real estate, after the bonds of the government, bearing six per centum, were either called in for redemption or refunded in bonds of less rate of interest, and that, by reason of circumstances not necessary to recount now, a portion of this fund was thrown back upon their hands and lay in great measure idle because they could not obtain a satisfactory place to invest it.] [1]

[If the charge in the application was one of male fides on their part in seeking to obtain good securities for the fund, it could not be sustained; but the gravamen of the charge is, that they have not paid to the widow " a sum annually equal to the interest on the said bonds." The reply is: We have no funds to draw from; we have filed our final account as to the residue of the estate and distributed it all to the heirs, and the widow made no objection. It was not her business to object. The will of her husband gave her this fund to receive her support and maintenance from, during her natural life. Her husband, in order to certainly insure her the amount of the interest to her promptly and surely, without fail from any cause, had guarded against any danger of her not getting this sum annually by providing further in his will, that if the government should cancel the bonds by payment, " or should any other possible contingency arise by which the interest on said bonds would not be available, etc., . . . . my said wife shall draw from my estate a sum annually equal to the interest on said bonds." It was not argued, although it might have been, that the provision relates and is confined only to the investment while it remains in the bonds of the government, and had relation to delays in collecting interest, and so forth. This would be too specious entirely; for the testator seemed to anticipate that the government would soon pay off or cancel its obligations, and he must have had in mind that this money must be invested in other securities. We hold, therefore, that

the deficit in the payment of six per cent. upon $8,000 is to be made good from the testator's estate whenever "any contingency arises" which requires it, during the lifetime of the widow.] [2]

There is another provision in the will which lends additional force to this construction and conclusion. It is found in the latter part of the clause distributing the remainder of his estate. Here he divides the remainder amongst his children; but, as if his mind kept turning upon his wife and his anxiety was to protect her, he says: "Subject always, however, to the provisions hereinbefore made for the livelihood of my dear wife, Mary A."

[The provisions as we have seen that are pertinent to the present question, were that $8,000 should be invested and the interest payable to her for her own absolute use and control, and if for any cause this interest was not available, she was to draw a like sum from the estate. The executors were bound to know this and provide for it. It is not in our opinion a sufficient answer to say, we have distributed to the heirs all the remainder of the estate. The law of their existence, the will itself directing and governing their conduct with reference to this, makes the distribution of the remainder subject always to provisions for the widow.] [3]

[But where shall the moneys come from, the remainder being distributed? With that we have nothing to do. The executors may advance it themselves, and doing so, the court will protect them upon the final distribution upon the death of the widow. They may borrow it upon the strength of the securities in which the $8,000 is invested as collateral, or such other way as to them may seem proper; but they must pay from some source to the widow, now, what is due her under our construction of this will.] [4]

[It is, therefore, now adjudged, ordered and decreed that the executors of John Sankey, deceased, pay, or cause to be paid a sum of money equal to the annual interest upon $8,000, at the rate of six per cent, less the amounts by her received during the period of time since the foreclosure of the McCool mortgage, and pay the same within 30 days after said amount is ascertained by David F. Fortney, Esq., who is hereby appointed to hear the parties or their attorneys and report the

same to and file his statement of the amount with the clerk of the Orphans' Court, and on failure to pay the same or show sufficient cause why it is not paid, a writ of attachment shall issue to enforce the same.] [5]

The executors thereupon took this appeal assigning as error:
1–5. The portions of the opinion and decree embraced in [ ] [1 to 5]
6. The refusal of the court to dismiss the rule and to direct petitioner to pay the costs.

*Messrs. Beaver, Gephart & Dale*, for the appellants.

*Messrs. Orvis, Bower & Orvis*, for the appellee.

PER CURIAM:

This case has been so well discussed by the learned judge of the Orphans' Court that we affirm the decree for the reasons given by him.

> The decree is affirmed and the appeal dismissed at the costs of the appellants.